UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANNE MARIE DACOSTA,     )
               )
    Plaintiff,       )
               )
    v.           )   Case No. 3:17-cv-30085-KAR
               )
NANCY A. BERRYHILL,     )
Acting Commissioner of Social     )
Security Administration,     )
               )
    Defendant.      )

MEMORANDUM AND ORDER REGARDING PLAINTIFF'S MOTION FOR JUDGMENT
ON THE PLEADINGS AND DEFENDANT'S MOTION TO AFFIRM THE
COMMISSIONER'S DECISION
(Docket Nos. 11 & 15)

ROBERTSON, U.S.M.J.

I.    PROCEDURAL BACKGROUND

Anne Marie Dacosta ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) seeking review of a final decision of the Acting Commissioner of Social Security

("Commissioner") denying her application for Social Security Disability Insurance Benefits

("DIB") and Supplemental Security Income ("SSI"). Plaintiff applied for DIB and SSI on

February 24, 2011 and March 23, 2011, respectively, alleging an August 16, 2006 onset due to

problems stemming from a variety of impairments including: bipolar disorder, multiple

personality disorder, anxiety/post-traumatic stress disorder (PTSD), attention deficit

hyperactivity disorder (ADHD), asthma/bronchitis, endometriosis, MRSA right toe, migraine

headaches, back pain, and ankle pain (Administrative Record ("A.R.") 467-475, 479-488, 521-

22). Her applications were denied initially (A.R. 346-351) and on reconsideration (A.R. 353,

357-59). She requested a hearing before an ALJ (A.R. 363) and one was held on November 14,

2013 (A.R. 145-181). On January 28, 2014, the Administrative Law Judge ("ALJ") issued a partially favorable decision, finding that Plaintiff was disabled for a closed period from August 16, 2006 through October 8, 2011, but was not disabled from October 8, 2011 through the date of the decision (A.R. 300-319). Plaintiff sought review of the decision (A.R. 464). The Appeals Council remanded the case to the ALJ to: evaluate the effect of Plaintiff's medication noncompliance on the severity of her mental health impairments; further evaluate her mental health impairments; consider and explain the weight assigned to nonexamining source opinions; give further consideration to Plaintiff's residual functional capacity (RFC) and identify record evidence supporting the assessed limitations; if warranted, obtain supplemental information from a vocational expert; and, if the result of this reconsideration was a decision favorable to Plaintiff, determine whether drug abuse or alcoholism was a contributing factor material to the determination of disability (A.R. 341-44). After a January 7, 2016 re-hearing (A.R. 182-219), the ALJ found that Plaintiff had not been disabled at any time between August 16, 2006 and the date of the decision and denied Plaintiff's claims (A.R. 96-140). The Appeals Council denied review (A.R. 1-6). Thus, the ALJ's second decision became the final decision of the Commissioner.

Plaintiff appeals from the ALJ's second decision on the grounds that: (1) the decision after remand was inconsistent with the ALJ's first decision notwithstanding that there was no new evidence before the ALJ and this constituted error as a matter of law; and (2) the ALJ erred by failing to accord controlling weight to the opinion of Plaintiff's treating mental health care provider (Dkt. No. 12 at 8, 11). Pending before this court are Plaintiff's motion for judgment on the pleadings requesting that the Commissioner's decision be reversed or remanded for further proceedings (Dkt. No. 11), and the Commissioner's motion for an order affirming the decision of

the ALJ (Dkt. No. 15).  The parties have consented to this court's jurisdiction (Dkt. No. 18).  *See* 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.  For the reasons stated below, the court will grant the Commissioner's motion for an order affirming the Commissioner's decision and deny Plaintiff's motion.

II.    LEGAL STANDARDS

A.    Standard for Entitlement to DIB and SSI

In order to qualify for DIB and SSI, a claimant must demonstrate that she is disabled within the meaning of the Social Security Act.[1]  A claimant is disabled for purposes of DIB and SSI if she "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  A claimant is unable to engage in any substantial gainful activity when she is not only "unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives, or whether a specific job vacancy exists for [her], or whether [s]he would be hired if [s]he applied for work."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  The Commissioner evaluates a claimant's impairment under a five-step sequential evaluation process set forth in the regulations promulgated by the Social Security Administration ("SSA").  *See* 20 C.F.R. § 404.1520(a)(4)(i-v).[2]  The hearing officer must determine:  (1) whether the claimant is

---

[1] There is no challenge to Plaintiff's insured status for purposes of entitlement to DIB, *see* 42 U.S.C. § 423(a)(1)(A), or to her financial need for purposes of entitlement to SSI, *see* 42 U.S.C. § 1381a.

[2] The administrative regulations applicable to Title II (DIB) are found in 20 C.F.R. Part 404, while the regulations applicable to Title XVI (SSI) are found in 20 C.F.R. Part 416.  Because the

engaged in substantial gainful activity; (2) whether the claimant suffers from a severe

impairment; (3) whether the impairment meets or equals a listed impairment contained in

Appendix 1 to the regulations; (4) whether the impairment prevents the claimant from

performing previous relevant work; and (5) whether the impairment prevents the claimant from

doing any work considering the claimant's age, education, and work experience.  *See id; see also*

*Goodermote v. Sec'y of Health & Human Servs.*, 690 F.2d 5, 6-7 (1st Cir. 1982) (describing the

five-step process).  If the hearing officer determines at any step of the evaluation that the

claimant is or is not disabled, the analysis does not continue to the next step.  20 C.F.R. §

404.1520(a)(4).

Before proceeding to steps four and five, the Commissioner must make an assessment of

the claimant's RFC, which the Commissioner uses at step four to determine whether the claimant

can do past relevant work and at step five to determine if the claimant can adjust to other work.

*See id.*

> RFC is what an individual can still do despite his or her limitations.  RFC is an
> administrative assessment of the extent to which an individual's medically determinable
> impairment(s), including any related symptoms, such as pain, may cause physical or
> mental limitations or restrictions that may affect his or her capacity to do work-related
> physical and mental activities

Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (July 2, 1996).

The claimant has the burden of proof through step four of the analysis, including the

burden to demonstrate RFC.  *Flaherty v. Astrue*, Civil Action No. 11-11156-TSH, 2013 WL

4784419, at *8-9 (D. Mass. Sept. 5, 2013) (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th

Cir. 2004)).  At step five, the Commissioner has the burden of showing the existence of jobs in

---

Title II and Title XVI regulations do not differ substantively, the court generally refers solely to
the Title II regulations in this Memorandum and Order.

the national economy that the claimant can perform notwithstanding his or her restrictions and limitations. *Goodermote*, 690 F.2d at 7.

B.      <u>Standard of Review</u>

The district court may enter a judgment affirming, modifying, or reversing the final decision of the Commissioner, with or without remanding for rehearing. *See* 42 U.S.C. § 405(g). Judicial review "is limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." *Ward v. Comm'r of Soc. Sec.*, 211 F.3d 652, 655 (1st Cir. 2000). The court reviews questions of law *de novo*, but must defer to the ALJ's findings of fact if they are supported by substantial evidence. *Id.* (citing *Nguyen v. Chater,* 172 F.3d 31, 35 (1st Cir. 1999) (per curiam)). Substantial evidence exists "'if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion.'" *Irlanda Ortiz v. Sec'y of Health & Human Servs.*, 955 F.2d 765, 769 (1st Cir. 1991) (quoting *Rodriguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 222 (1st Cir. 1981)). "While 'substantial evidence' is 'more than a scintilla,' it certainly does not approach the preponderance-of-the-evidence standard normally found in civil cases." *Bath Iron Works Corp. v. U.S. Dep't of Labor*, 336 F.3d 51, 56 (1st Cir. 2003) (citing *Sprague v. Dir., Office of Workers' Comp. Programs*, *U.S. Dep't of Labor*, 688 F.2d 862, 865 (1st Cir. 1982)). In applying the substantial evidence standard, the court must be mindful that it is the province of the ALJ, and not the courts, to determine issues of credibility, resolve conflicts in the evidence, and draw conclusions from such evidence. *See Irlanda Ortiz*, 955 F.2d at 769. So long as the substantial evidence standard is met, the ALJ's factual findings are conclusive even if the record "arguably could support a different conclusion." *Id.* at 770. That said, the ALJ may not ignore evidence, misapply the law, or judge matters entrusted to experts. *Nguyen*, 172 F.3d at 35.

III.    RELEVANT FACTS

A.      Plaintiff's Background

Plaintiff was 36 on the date of the second hearing.  She had attended one year of college.

She lived with her sixteen-year-old son and had partial custody of her two-year-old daughter.

She had not worked since the alleged onset of disability (August 2006).  Before that, she had

worked as a cashier, a store manager, and a waitress (A.R. 187-190).  At the time of the second

hearing, she had reactivated her driver's license (A.R. 188-89).

B.      Medical Records Relevant to Plaintiff's Claims

Plaintiff's medical history is lengthy and complex.  The court summarizes portions of the

medical history that appear most relevant to Plaintiff's claims of error which are the records

related to Plaintiff's mental health impairments.

On August 6, 2006, Plaintiff went to the emergency room reporting depression and

suicidal ideation and was hospitalized at a behavioral health hospital (A.R. 602-03).  She was

diagnosed with adjustment disorder, PTSD, and depression with suicidal ideation (A.R. 606).

She tested positive for the use of marijuana and cocaine (A.R. 605).  While hospitalized, she

consulted with a social worker and was given Remeron.  According to the August 9, 2006

hospital notes, the patient was very much improved on discharge.  Her depression seemed to

have resolved.  She was discharged with a prescription for Celexa, a referral to a therapist, and a

scheduled appointment with a psychiatrist.  She was assigned a Global Assessment of

Functioning Score (GAF) score of 50 on discharge (A.R. 600).[3]

---

[3] "A Global Assessment of Functioning score rates a person's overall level of functioning."
*Curley v. Comm'r of Soc. Sec.*, CIVIL ACTION NO. 16-11240-IT, 2017 WL 2624225, at *2 n.5
(D. Mass. May 30, 2017) (Report and Recommendation), *adopted*, 2017 WL 2622745 (D. Mass.
June 16, 2017).  The use of GAF scores "has recently fallen into disfavor as an assessment tool."
*Bourinot v. Colvin*, 95 F. Supp. 3d 161, 178 (D. Mass. 2015).  The SSA has nonetheless

On August 29, 2006, Plaintiff was admitted to a psychiatric inpatient unit, reporting depression and suicidal ideation.  She reported being involved with heavy substance abuse (crack and powder cocaine) (A.R. 614).  She was diagnosed with major depressive disorder, recurrent, and cocaine abuse (A.R. 981).  She was discharged on September 4, 2006 with a GAF score of 50.  Her overall mood, judgment, and insight had improved.  She had no delusions, hallucinations, or suicidal ideation.  It was noted that she would be following up at the Griswold Center for treatment related to her mental health (A.R. 981).

From November 2006 through April 2007, Plaintiff received follow-up care from physician Merrilee Leonhardt (A.R. 608).  On November 10, 2006, treatment notes indicate that Plaintiff was diagnosed with a mood disorder not otherwise specified, rule out bipolar disorder, and cocaine and marijuana dependence, reported sober.  Plaintiff further reported that she was irritable and experiencing mood swings.  Her sleep was disrupted, but her attention, concentration, and memory were grossly intact.  Her past medical history was reportedly positive for migraines.  Dr. Leonhardt prescribed Remeron, Celexa, and lithium and assessed a GAF score of 65 (A.R. 608).  In December 2006, Plaintiff was judged stable.  She was not taking lithium, but continued to take Celexa.   Seroquel was substituted for Remeron.  Her primary care physician had prescribed Ritalin (A.R. at 610).  Plaintiff returned for treatment with Dr.

---

indicated that it will continue to receive GAF scores into evidence subject to Administrative Memorandum AM-13066, which guides ALJs "on how to consider GAF ratings." *Id.* (citing *Hall v. Colvin*, 18 F. Supp. 3d 144, 153 (D.R.I. 2014)).  A GAF score of 61 to 70 is indicative of some mild symptoms or some mild difficulty in social or occupational functioning; a GAF score of 51 to 60 is indicative of moderate symptoms or moderate difficulty in social or occupational functioning; and a GAF score of 41 to 50 is indicative of serious symptoms or serious impairments in social or occupational functioning. Am. Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000).  The ALJ relied to some extent on GAF scores in Plaintiff's records in his initial partially favorable decision (A.R. 312, 315-16).  He did not rely on GAF scores in his second decision.

Leonhardt on April 27, 2007, reporting that she had been in Portugal in the interim and had discontinued her medications in February. Plaintiff reported being very depressed. She was nonetheless alert and oriented times three and her affect was appropriate. Dr. Leonhardt restarted her on Celexa and Remeron (A.R. 612). The next record of mental health treatment is on December 19, 2007, when Plaintiff saw licensed social worker Kipp Armstrong, at which time her GAF score was assessed at 56 (A.R. 1075).

On March 5, 2008, Plaintiff went to the emergency room, requested a psychiatric evaluation, and was admitted. She reported auditory hallucinations and suicidal ideation. She had tried to cut her wrists two days ago. She appeared depressed, and was wrapped in a blanket and rocking. She reported that she had started using cocaine and marijuana around two days earlier (A.R. 776-77). She presented with depression and was diagnosed with a substance-induced mood disorder. Plaintiff was discharged on March 10, 2008. According to the discharge report, the treating care providers "straightened out [Plaintiff's] medications and streamlined their dosages." The hospital prescribed Paxil, Wellbutrin, Vistaril on an as needed basis for anxiety, and ReVia to address cravings for cocaine. Prescriptions for Ritalin, Xanax, Zyprexa, and Celexa were discontinued. A mental status examination on discharge indicated that Plaintiff was pleasant, related well, had a logical and goal directed thought process, an appropriate affect, intact judgment, and good insight. She denied suicidal ideation. Her GAF score at discharge was assessed at 70. Her prognosis was judged to be excellent provided she remained sober and attended outpatient treatment (A.R. 979-980).

Plaintiff was hospitalized again from December 14 to December 19, 2008 for increased signs of depression (A.R. 971). She presented at the hospital with cuts to her wrist and an overdose of "attention deficit pills." She tested positive for use of cocaine and marijuana (A.R.

969).  The diagnosis on discharge was cocaine-induced mood disorder.  The results of a mental status examination on discharge were that Plaintiff was pleasant, related well, and showed a logical and goal directed thought process.  Her affect was appropriate, her insight good, and her judgment intact.  Her GAF score was again assessed at 70.  Her prognosis on release was guarded because she appeared "ambivalently connected to her need for sobriety" (A.R. 969-970).  Follow up care was expected to be with Imad Khreim, M.D., whom Plaintiff had seen on March 27, 2008 (A.R. 1092), and Mr. Armstrong (A.R. 970).

Plaintiff saw Dr. Khreim on January 27, February 26, April 6, May 7, and July 28, 2009 (A.R. 1080-81, 1083-1090).  Dr. Khreim diagnosed mood disorder not otherwise specified and polysubstance dependence in partial remission.  The goal of treatment was to reduce and control symptoms, avoid hospitalizations, and maintain and improve functioning.  In January, Plaintiff reported that she was still having difficulties, but felt that the Zyprexa was helping with sleep and anxiety.  She was alert and oriented times three, with a normal attention span.  There were no mood swings.  Her insight and judgment were fair.  In February, Dr. Khreim observed that Plaintiff was "stabilizing."  Her affect had improved and she reported no substance abuse.  By March 2009, Plaintiff reported feeling "much better."  She was attending individual counseling and a rehabilitation program.  In May 2009, Plaintiff saw Dr. Khreim after "a long time of no show."  She reported that she had felt worse and had been hospitalized for a few days but was feeling better by the time of her appointment.  Dr. Khreim reviewed and reconciled Plaintiff's medications.  He observed that Plaintiff was alert, oriented times three, and had an appropriate affect.  Her attention span was normal and she was not experiencing mood swings.  She reported no substance abuse.  Dr. Khreim continued her on Cymbalta and Zyprexa.  On July 28, 2009, Dr. Khreim noted that Plaintiff reported that she was compliant with her medication regime but

was still experiencing anxiety. She had taken a Klonopin from a friend but otherwise reported no substance abuse. Dr. Khreim noted that Plaintiff was alert and oriented time three. Her affect was anxious. She was not experiencing mood swings, her attention span was normal, and her insight and judgment were fair. Dr. Khreim adjusted Plaintiff's medication by adding clonidine (A.R. 1080-81, 1083-1090).

On April 30, 2009, while Plaintiff was in treatment with Dr. Khreim, she was admitted to the hospital for a Zyprexa overdose after she was evicted from her apartment (A.R. 701). She was discharged on May 6, 2009, with diagnoses on discharge of bipolar disorder with a recent episode of depression and cocaine abuse and migraine headaches. Her medications on discharge were Buspirone, olanzapine, hydroxyzine as needed for anxiety, Lamictal (a mood stabilizer), and Cymbalta (A.R. 703). Her discharge status was "improved." On the day of her discharge, Plaintiff reported being in a "good mood." She said that the medications seemed to be helping. Her GAF score was assessed at 58 (A.R. 703). Her next – and, so far as appears in this administrative record, final – psychiatric hospitalization was on March 5, 2010. Plaintiff's mother called an ambulance service. Plaintiff told the EMTs she had not taken her psychiatric medications for the last three days. On admission, she was restless, rambling in her speech, and suffering from auditory hallucinations (A.R. 853, 857). A drug screen was negative (A.R. 855). The diagnosis at discharge on March 7, 2010 was altered mental status due to neuroleptic malignant syndrome and drug withdrawal, anxiety, depression, and asthma (A.R. 857).

Treatment notes from Plaintiff's counseling with Mr. Armstrong on May 19, 2010, indicate that Mr. Armstrong was treating Plaintiff for major depressive disorder, borderline personality disorder, and maintenance of sobriety from polysubstance abuse, which was in remission. Plaintiff was alert, cooperative, and oriented times three. Her mood was moderately

depressed and her affect was anxious (A.R. 834). Mr. Armstrong's notes through December 7, 2010 consistently report that Plaintiff was alert, cooperative, and oriented times three. Mr. Armstrong continued to observe, however, that Plaintiff was depressed and her affect disturbed. Throughout 2010, Plaintiff reported abstinence from drugs. She regularly spoke about events in her personal life, including those relating to the custody of her son and other interactions with her family, that were causing significant stress (A.R. 820-833).

On January 7, 2011, Mr. Armstrong was interviewed in connection with Plaintiff's application for state disability benefits. Mr. Armstrong reported that Plaintiff had a very confusing presentation because it varied so much. Sometimes she appeared quite organized. At other times, she was profoundly disorganized. Mr. Armstrong said that he very often had no idea what she was talking about. He expressed the view that Plaintiff was either "quite reality impaired a lot of the time or she is a pathological liar who is trying to use therapy to support other arguments she is having in the community." Mr. Armstrong stated that Plaintiff had chronic anxiety, a history of panic attacks, and a diagnosis of PTSD. He did not believe she had flashbacks. Socially, she came across as "sort of bizarre and paranoid." He "really did not have high hopes about her getting herself together" (A.R. at 786). On January 20, 2011, Plaintiff was found disabled though January 19, 2013 for purposes of the state's program of transitional aid to families with dependent children (A.R. 779).

On June 4, 2011, Plaintiff was brought by ambulance to the emergency room because she had slashed her left wrist. She reported consuming alcohol. She was kept under observation for four hours, then determined to be stable for discharge (A.R. 945-46). On December 6, 2011, she was back in the emergency room after having had a fight while intoxicated that resulted in a

broken nose. She was found to be pregnant. She was kept under observation for some two to three hours, then discharged in stable condition (A.R. 938-944).

An updated treatment plan completed by Mr. Armstrong around September 19, 2011 indicated that Plaintiff "continue[d] to have periods of strong attendance and periods of absence. Mr. Armstrong observed that Plaintiff continued to report periods of "extreme chaos" in her life, and that this chaos, in conjunction with "labile symptomology," contributed to slow progress towards improving her level of functionality. She was assigned a GAF score of 46 (A.R. 1067). Plaintiff's last treatment with Mr. Armstrong at the Griswold Center was on January 24, 2012 (A.R. 1066).

Plaintiff resumed counseling on August 10, 2012 with psychologist Doug Smith, Ph.D., after a six-month hiatus (A.R. 1172). Dr. Smith's provisional diagnoses were PTSD and recurrent depression. Plaintiff reported that she was depressed, but the depression was under control. Her most significant problem was anxiety. She said she had not used alcohol, cocaine or marijuana for three or four years and that she was not taking antidepressant medication. She told Dr. Smith that she hoped to go to work soon (A.R. 1172-73). In the next few sessions, Dr. Smith refined the diagnoses to PTSD, panic disorder, and recurrent major depression in partial remission (A.R. 1168). Plaintiff continued her therapy with Dr. Smith, who observed that she was anxious and had a level of energy that could be problematic in her response to stresses with family members, her significant other, and other acquaintances. Dr. Smith described her as neatly dressed, well-groomed, and coherent and logical, but overly emotional and labile. As of January 2013, she was not taking medication for her psychological symptoms because she was pregnant (A.R. 1126-1171).

On May 7, 2013, Plaintiff had an appointment with advanced practice registered nurse Susan Williams to consider medication options. Plaintiff told Ms. Williams that she had not been taking medication for her mental health impairments for twelve to eighteen months. She had recently given birth. Ms. Williams observed that Plaintiff was alert and oriented and mildly anxious but not depressed, and deferred medication because Plaintiff planned to nurse her daughter. Ms. Williams assigned Plaintiff a GAF score of about 60 (A.R. 1122-24).

After a gap in treatment, Plaintiff returned to counseling with Dr. Smith on June 18, 2013 after the birth of her daughter. She was neatly groomed. She appeared well-rested and healthy. She was coherent but anxious and labile. Her orientation and memory were intact. She was living with the infant's grandmother on the father's side, which was a more stable environment than her previous living situation (A.R. 1197). An updated treatment plan signed by Dr. Smith and Plaintiff on October 8, 2013 indicates that Plaintiff had only been able to attend three sessions in the last three months. Her diagnoses remained PTSD, panic disorder without agoraphobia, and recurrent major depression in partial remission. Dr. Smith noted minor progress with panic but continued problems with lability and vulnerability in her relationships with her emotional supports. Dr. Smith noted as strengths that Plaintiff was likeable, creative, and energetic. He assigned a GAF score of 60 (A.R. 1199).

Plaintiff saw Ms. Williams again on October 8, 2013. Plaintiff had been taking a small dose of Zoloft for two or three months, and Ms. Williams increased the dosage (A.R. 1196). Ms. Williams observed that Plaintiff was alert and oriented times three but fairly anxious. Plaintiff reported that therapy with Dr. Smith was going well. Ms. Williams recorded diagnoses of PTSD, recurrent major depressive disorder, polysubstance abuse in remission for about a year and a half, and borderline personality disorder. She assigned Plaintiff a GAF score of 60 (A.R.

1196).  It appears that Plaintiff's last therapy session with Dr. Smith in 2013 was on the third of December.  Dr. Smith observed a "strong sense of autonomy and less helplessness and panic ideation" than he had noted in prior sessions.  She was babysitting for some children in her family on a regular basis (A.R. 1303).

Plaintiff treated with Dr. Smith on May 16, 2014 (A.R. 1302), and continued therapy, with occasional gaps in treatment, through at least November 20, 2015 (A.R. 1434). Treatment records reflect that, with some exceptions (A.R. 1288), Dr. Smith saw general improvement in Plaintiff's functioning notwithstanding significant personal challenges, including the breakdown of her relationship with the father of her daughter and custody issues related to the child.  On August 13, 2014, Dr. Smith indicated that Plaintiff was upbeat, cheerful and less stressed.  Her behavior and function seemed to be somewhat improved (A.R. 1282).  On November 20, 2014, Plaintiff's status appeared to be improved despite infrequent attendance at therapy.  She was continuing to cope and appeared to be in less distress (A.R. 1275).  On August 14, 2015, Plaintiff was "coping fairly well with her PTSD symptoms" and did "not appear agitated."  She continued to be able to listen, process information, and share experiences.  The effort in therapy was to sustain reasonable functioning and promote longer term improved functioning (A.R. 1253).

On September 2, 2015, after Plaintiff missed an appointment with Ms. Williams, she was seen by Stephen Greenberg, M.D., for medication management.  Plaintiff reported to Dr. Greenberg that she had been functioning fairly well, although she also reported panic attacks once or twice a month, flashbacks to earlier abuse, feeling overwhelmed, and being easily upset. Assessing Plaintiff's mental status, Dr. Greenberg noted that she was cooperative, her speech was normal in rate and rhythm, she was oriented times three, her cognitive functioning and memory were "grossly intact," and there was no indication of a thought disorder.  Her mood was

slightly anxious and her affect slightly constricted, but appropriate as to content. Her judgment

and insight appeared fair. In terms of strengths, she was voluntarily seeking treatment and was

in a stable living situation. Dr. Greenberg added gabapentin to the Zoloft and Topamax that she

was taking. He deemed her prognosis to be fair and assigned her a GAF of 49 (A.R. 1462-63).

Dr. Greenberg saw Plaintiff again on October 7, 2015. Plaintiff reported that she had had a

significant improvement in her panic and anxiety. Dr. Greenberg judged her mental status to be

"essentially within normal limits" (A.R. 1457). On November 18, 2015, Plaintiff told Dr.

Greenberg she was doing well. Her mood was euthymic, and her irritability much improved

(A.R. 1437).

      C.    <u>Opinion Evidence</u>

      1.    <u>Consultative Examinations</u>

On March 30, 2009, Robert Storey, Ed.D., conducted a psychological evaluation of

Plaintiff following a referral from the Department of Families and Children in connection with a

care and protection matter after Plaintiff attempted suicide. Dr. Storey indicated that his findings

strongly suggested that Plaintiff was experiencing bipolar disorder with rapid cycling. Plaintiff

was aware that she suffered from a psychiatric illness that could impair her ability to parent her

son without effective and uninterrupted treatment. In Dr. Storey's judgment, she needed

individual psychotherapy focused on the resolution of her abuse history, mood regulation,

fostering independence, and supporting continuing educational endeavors directed toward viable

occupational objectives. Plaintiff also needed continuous adherence to a well-tailored

psychiatric plan, and abstinence/sobriety. Dr. Storey diagnosed bipolar disorder I, anxiety

disorder not otherwise specified, features of PTSD, ADHD (by history), alcohol and cocaine

abuse/dependence, and features of a borderline personality disorder. He assigned her a GAF score of between 50 and 60 (A.R. 836-843).

Lindsay Olden, Psy.D., conducted a consultative evaluation of Plaintiff on October 8, 2011 at the request of the Massachusetts Rehabilitation Commission Disability Determination Services (DDS). Plaintiff reported that she spent a lot of time lying around, took walks, and tried to get out the house. She said she had been unemployed for the last one to two years. She was currently unable to work because there were no jobs within walking distance. Asked about her social adjustment, Plaintiff reported that she was sometimes able to get along with others. She did not have problems understanding and following instructions or accepting criticism. She had difficulty reading or watching TV because of ADHD. She reported a history of depression for most of her life that got worse in 2007. She said she frequently forgot to bathe or take care of herself. She could cook and shop but did not often feel like doing these things. She reported a history of psychiatric hospitalizations related to being stressed out, harming herself, not being able to function, or being depressed. Asked about social contacts, she reported a few friends and her parents (A.R. 910-14).

In connection with an assessment of Plaintiff's mental status, Dr. Olden observed that Plaintiff arrived for the appointment on time, appropriately dressed with good grooming. She was cooperative. Her speech was normal in volume, rate, and tone. Her affect was flat with a depressed mood. Her attention and concentration were "grossly intact." She received 27 out of 30 on the mini-mental status examination, evidencing a generally normal range of deficits in her cognitive skills. Dr. Olden diagnosed major depressive disorder, with anxiety disorder and bipolar disorder to be ruled out. Cocaine dependence was in remission. He assigned Plaintiff a GAF score of 55 (A.R. 912-13).

2. <u>State Agency Reviews</u>

Howard S. Leizer, Ph.D., a state agency psychologist, reviewed Plaintiff's medical records as of October 21, 2011, and found that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of an extended period (A.R. 231, 249). He opined that Plaintiff was not significantly limited in her ability to carry out detailed or simple instructions, sustain an ordinary routine, or make simple work-related decisions. He further opined that she was moderately limited in her ability to maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance and be punctual, and complete a normal workweek without interruption from psychologically based symptoms (A.R. 234-35, 252-53). He concluded she was moderately limited in her ability to interact with the general public, but otherwise not significantly limited in her ability to interact with others (A.R. 235, 253). In a narrative section of the review, Dr. Leizer indicated that records related to Plaintiff's depression, anxiety, bipolar disorder, PTSD, and ADHD showed that she was able to cooperate, understand, remember, and perform simple, routine work notwithstanding these impairments (A.R. 239, 257).

On April 25, 2012, on reconsideration, John J. Warren, Ed.D., agreed that Plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation of an extended period (A.R. 271). Dr. Warren opined that Plaintiff was markedly limited in her ability to carry out detailed instructions, but otherwise he was in substantial agreement with Dr. Leizer as to Plaintiff's abilities and limitations. In a narrative section of the review, he explained that, in his opinion, Plaintiff was able to sustain the mental

demands of carrying out simple tasks over the course of a routine work day and work week within acceptable attention, persistence, and pace tolerances, but would be unable to do so for moderately or highly complex or detailed tasks that required sustained concentration. As to difficulties in social functioning, Dr. Warren opined that Plaintiff would be able to sustain the basic demands of interacting with supervisors and co-workers, but would not be able to interact appropriately with members of the general public (A.R. 274-75).

      3.  <u>Treating Care Provider</u>

On November 13, 2013, Dr. Smith authored a treatment letter regarding Plaintiff. He reported that he had seen her for individual counseling for PTSD and major depression since August 2012. Her attendance had ranged from excellent to variable. Dr. Smith indicated that by history, Plaintiff's symptoms had varied, which was the pattern with PTSD. He saw some improvement in Plaintiff's stability, but believed that her symptoms and ability to function would remain variable for some time to come. Dr. Smith found Plaintiff to be challenged but effective in her role as a parent. He opined that "[a] full-time job would certainly challenge [Plaintiff's] coping ability at present" (A.R. 1201).

On the same date, Dr. Smith completed a mental health questionnaire, indicating that Plaintiff's impairment(s) had lasted or could be expected to last for at least twelve months and that she was not a malingerer. In terms of clinical findings, he stated that Plaintiff had "extreme lability and flashbacks as well as hopelessness and other symptoms of depression." He believed her prognosis was "fairly good." On a checklist of signs and symptoms, he indicated that over the past year, Plaintiff had experienced anhedonia, appetite disturbance with weight change, decreased energy, feelings of guilt or worthlessness, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, persistent disturbances

of mood or affect, persistent irrational fears, apprehensive expectation, intense and unstable personal relationships and impulsive behavior, emotional lability, vigilance and scanning, possible panic, sleep disturbance, and recurrent severe panic attacks. He indicated that she had mild restrictions in activities of daily living and moderate difficulties in maintaining social functioning and concentration, persistence and pace, but noted that these difficulties could be marked for brief periods of time. He indicated that Plaintiff had experienced one or two episodes of decompensation, each lasting at least two weeks, within a twelve month period. In a narrative section of the report, Dr. Smith stated that Plaintiff's PTSD symptoms occurred at unexpected times and could disrupt functioning for hours or days if Plaintiff was outside of a safe environment (A.R. 1204-07).

D.     Hearing Testimony

At the November 14, 2013 hearing, Plaintiff testified that she was 34 and lived with her son, who was 14, and her daughter who was six months old (A.R. 150-51). After Plaintiff answered the ALJ's questions about physical impairments, she testified that she had been diagnosed with PTSD and severe anxiety disorder. She had been in therapy off and on for some eight years. She had been hospitalized for mental health issues five or six times for depression and attempted suicide, with the last time being in 2008 or 2009. She agreed that she had a history of abusing drugs or alcohol and said she had been sober for 5 to 6 years. Her drugs of choice had been marijuana and cocaine, and sometimes she drank a little bit too much. She never had legal problems arising from her use of drugs or alcohol and never lost a job because of substance or alcohol abuse (A.R. 162-64).

Asked whether her mental health status limited her abilities, Plaintiff explained that her mental health problems affected her ability to get up and start her day. She did not want to leave

19

her house, and avoided people and situations that caused her anxiety, such as crowded venues (A.R. 163-64). She took Zoloft and was prescribed an anti-anxiety medication that she was not taking because she was nursing her daughter (A.R. 162). She did not have side effects from any medications she was taking (A.R. 165). In terms of daily activities, she cooked for herself and her family, washed clothes, and took care of her personal hygiene (A.R. 166). She did not have hobbies anymore, did not belong to any clubs or use the internet, and did not exercise. She went out to eat and to the mall (A.R. 166-67). She testified that a very severe level of anxiety was the primary reason that she had not been able to find or hold a job since 2006 (A.R. 167-68, 170-71). She viewed depression and ADHD as contributing factors (A.R. 168-69).

At the January 7, 2016 hearing, Plaintiff testified that she was 36. She was living with her 16-year-old son and had partial custody of her daughter, who was two and a half. She had renewed her driver's license and was able to drive to activities for her son and daughter and to shop (A.R. 187-89). She still had mental health issues, which she described as depression and anxiety. She took medication and was in therapy, which she attended weekly (A.R 192). Plaintiff said that anxiety caused her to avoid interactions with people and crowded places. Because of her depression, she sometimes could not get up in the morning (A.R. 194-95). She no longer had thoughts of suicide (A.R. 195). Asked about her daily activities, she said she got up, made sure her son went to school, cooked and washed clothes, and bathed and groomed herself on a good day. She did not go out to eat or to the mall, and she did not socialize. She had been sober since 2008. She used the internet occasionally and had a Facebook page (A.R. 201-02). She was unable to work because when she looked for work, the anxiety was just too much for her (A.R. 203). She testified that she had full-blown panic attacks maybe once a month (A.R. 211).

At the second hearing, the ALJ asked the vocational expert ("VE") to assume a hypothetical individual of the claimant's age, education, and work experience, limited to work requiring light exertion that was unskilled in nature. The ALJ specified that the work should entail no more than occasional coworker contact, defined as up to one-third of the workday, and no more than incidental contact with the general public, and should be in an environment with no more than incidental exposure to extreme cold or heat, or to fumes, dust, gases, or humidity. Finally, the ALJ specified that the work should not need to be performed at heights or using ladders, ropes, or scaffolding. The VE testified that such a hypothetical person would not be able to perform Plaintiff's past work, but could work in a job as a sorter, DOT code 922.687-086, of which there were approximately 40,000 jobs nationally with 750 in Massachusetts; a bench assembler, DOT code 729.687-010, of which there were approximately 25,000 jobs nationally and 750 in Massachusetts; and a bench inspector, DOT code 559.687-074, of which there were approximately 20,000 jobs nationally and 400 in Massachusetts. The VE further testified that if the hypothetical individual's ability to concentrate and maintain persistence and pace were impaired for at least 25 percent of the day by psychiatric limitations or pain or the individual would miss three or more days of work each month, the individual would be unemployable (A.R. 216-18).

E.     The ALJ's March 30, 2016 Opinion

In determining whether Plaintiff was disabled, the ALJ conducted the five-part analysis required by the regulations. *See* 20 C.F.R. § 404.1520(a)(4)(i-v); *see also Goodermote*, 690 F.2d at 6-7. At the first step, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of August 16, 2006 (A.R. 101). *See* 20 C.F.R. § 404.1571 *et seq.* At step two, the ALJ found that Plaintiff had the following severe impairments: migraine

headches, asthma, Wolff Parkinson-White syndrome,[4] bipolar disorder, posttraumatic stress disorder, and polysubstance abuse (in remission since approximately May 2009) (A.R. 102). *See* 20 C.F.R. § 404.1520(c). He concluded that Plaintiff's chronic low back pain and right ankle pain were not severe impairments (A.R. 120). For purposes of step three, he concluded that Plaintiff's impairments, either alone or in combination, did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (A.R. 121). The ALJ gave "specific consideration" to the factors required in the listings for asthma (listing 3.03), Wolff-Parkinson-White syndrome (listing 4.05), and headaches (listing 11.00), concluding as to each of these impairments that medical records did not satisfy the listing criteria (A.R. at 121). Plaintiff does not take issue with these findings.

The ALJ also addressed Plaintiff's mental health impairments, concluding that, singly or in combination, those impairments did not meet or medically equal the criteria in listings 12.04 (affective disorders, including bipolar syndrome); 12.06 (anxiety related disorders), or 12.09 (substance addiction disorders). In making this finding, the ALJ considered whether the so-called Paragraph B criteria were satisfied. He found that records, which he specifically identified, supported that Plaintiff had mild restrictions in the activities of daily living; moderate difficulties or limitations in social functioning; and moderate difficulties with regard to concentration, persistence or pace. The ALJ found that Plaintiff had a history of alcohol, cocaine, and marijuana abuse but that the overall evidence indicated that Plaintiff last abused/overused controlled substances in or around April 28, 2009, prior to her last

---

[4] Wolff-Parkinson White syndrome is a condition where an extra electrical pathway in the heart causes rapid heartbeat and associated symptoms including dizziness, fainting, fatigue, and anxiety. *See* Mayo Clinic, Wolff-Parkinson-White Syndrome, at https://diseases-conditions/wolff-parkinson-white-syndrome/symptoms-causes/sys-20354626 (last visited Oct. 25, 2018).

hospitalization for a suicide attempt. Plaintiff had four hospitalizations involving a suicide attempt or suicidal ideation after the alleged onset of disability, those being from August 29 to September 4, 2006; March 5 to March 10, 2008; December 14 to December 19, 2008; and April 29 to May 6, 2009 (A.R. 121; *see also supra*). The ALJ found that, while Plaintiff's use of controlled substances was a factor in all but one of these hospitalizations, there was no evidence that her substance abuse significantly interfered with her mental functioning such that it would disqualify her from gainful employment except at those points in time when she was hospitalized (A.R. 121). The records, he concluded, did not support episodes of decompensation meeting the Paragraph B criteria, because, although Plaintiff had been hospitalized multiple times for suicide attempts or suicide ideation following the alleged onset date, none of her hospitalizations lasted a minimum of two weeks (A.R. 122-23).

Turning to the next step, the ALJ found that Plaintiff had the RFC to perform light work[5] except that she was limited to unskilled tasks involving no more than occasional co-worker contact and no more than incidental public contact, and to jobs in which there would be no more than incidental exposure to extreme cold, heat, fumes, dust, gases, or humidity and no exposure to dangerous moving machinery or bright sunny environments. She was further limited to jobs that required no working at heights, or using ladders, ropes or scaffolds, and there could be no

---

[5] Light work is defined as:

> work [that] involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. § 404.1567(b).

more than occasional stooping, kneeling, crouching, crawling, or climbing ramps or stairs (A.R. 123). He concluded that this RFC precluded Plaintiff from performing any past relevant work. Relying on the VE's testimony, he concluded that there were jobs that existed in significant number in the national economy that Plaintiff could perform (A.R. 132).

IV.   ANALYSIS

A.   The ALJ Complied with the Appeals Council's Remand Order and the Second Decision was Supported by Substantial Evidence.

The ALJ issued his partially favorable decision on January 28, 2014. Plaintiff asked the Appeals Council to review the decision. On review, based on the authority granted to it under 20 C.F.R. §§ 404.977 and 416.1477, the Appeals Council vacated the initial decision and remanded the case to the ALJ with instructions that he:

- Evaluate the effects of the claimant's medication noncompliance on the severity of the claimant's mental impairments.

- Further evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 404.1520a and 416.920a, documenting application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 404.1520a(c) and 416.920a(c).

- Give further consideration to the nonexamining source opinions pursuant to the provisions of 20 CFR 404.1527(e) and 416.927(e) and Social Security Ruling 96-6p, and explain the weight given to such opinion evidence.

- Give further consideration to the claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations (20 CFR 404.1545 and 416.945 and Social Security Ruling 85-16 and 96-8p).

- If warranted by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Ruling 83-14). The hypothetical questions should reflect the specific capacity /limitations established by the record as a whole. The [ALJ] will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before

relying on the vocational evidence, the [ALJ] will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

- If the claimant is found disabled, conduct the further proceedings required to determine whether drug addiction and alcoholism are contributing factors material to the determination of disability.

(A.R. 343-44).

In his initial decision, the ALJ found that Plaintiff was disabled for a closed period of time from August 16, 2006 – the date of alleged onset – through October 8, 2011. In the ALJ's second decision, issued after remand from the Appeals Council, the ALJ found that Plaintiff was not disabled at any point from the alleged date of onset to the date of the second decision. The ALJ did not obtain any new evidence about the period between August 16, 2006 and October 8, 2011 prior to issuing the second decision; rather, he based his second decision on the existing record. Plaintiff's first contention on appeal is that the ALJ erred as a matter of law because he changed his decision without any "new support or evidence in the record to support the conclusions in the second Decision" (Dkt. No. 12 at 10-11). Plaintiff cites no support for this contention, which is an inaccurate statement of the law.

"On remand, an ALJ 'shall take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's order.'" *Cook v. Berryhill*, CIVIL ACTION NO. 14-40110-DHH, 2017 WL 1135221, at *11 (quoting 20 C.F.R. § 404.977(b); citing *Ellis v. Colvin*, 29 F. Supp. 3d 288, 300 (W.D.N.Y. 2014) (holding that a failure to follow the Appeals Council's instructions is legal error even if the Appeals Council affirms the ALJ's subsequent decision)). "An ALJ's decision on the merits of a disability application does not become final and binding if the Appeals Council vacates that

decision and remands the matter for further proceedings." *Kearney v. Colvin*, 14 F. Supp. 3d 943, 949 (S.D. Ohio 2014) (citing *Wireman v. Comm'r of Soc. Sec.*, 60 Fed. App'x. 570, 570 (6th Cir. 2003)). An ALJ tasked with deciding a remanded claim is not bound by prior conclusions or findings if those conclusions or findings have not been adopted by the Appeals Council. *Cf. Nichols v. US Soc. Sec. Admin., Acting Comm'r*, Case No. 16-cv-443-PB, 2018 WL 1307645, at *5 (D.N.H. Mar. 13, 2018) (when an ALJ's decision was vacated and the case was remanded to a different ALJ, the second ALJ was not bound in any way by the findings and conclusions of the first ALJ to whom the case was initially assigned; citing cases). "On the contrary, when an initial ALJ's decision is vacated and remanded by the Appeals Council, as here, the ALJ is typically directed to issue a 'new decision' after offering the claimant 'a new hearing.'" *Id.* (citing HALLEX I-2-8-18(A), 1993 WL 643058 (S.S.A. May 26, 2017)). "[A]s long as his decision is supported by substantial evidence, an ALJ's failure to explain why or how his RFC finding deviates from that of a since vacated, prior decision does not constitute a viable basis for reversal." *Id.* (citing cases); *see also Boardway v. Berryhill*, Case No. 3:17-cv-30069-KAR, 2018 WL 4323823, at *16 (D. Mass. Sept. 10, 2018) (on remand, the ALJ was not bound by her prior assessment of a physician's opinion; citing 20 C.F.R. § 404.955(a)). Because the ALJ did not commit an error of law by revising his finding as to Plaintiff's disability status without taking new evidence on remand from the Appeals Council, Plaintiff is not entitled to a remand "for another Hearing for clarification on this issue" (Dkt. No. 12 at 11).

Although Plaintiff does not argue that the ALJ failed to comply with the Appeals Council's directions or that his second decision was not supported by substantial evidence, the court briefly addresses these points. The Appeals Council directed the ALJ to further evaluate the claimant's mental impairments by reference to the four functional areas set out in 20 C.F.R. §

404.1520a[6] and consider the effects of Plaintiff's medication noncompliance on the severity of her mental health impairments (A.R. 343). The ALJ addressed each of the four functional areas, pointing to record references, including treatment notes from Dr. Smith, Plaintiff's treating psychologist (A.R. at 122-23). As to Plaintiff's compliance with treatment for her mental health impairments, the ALJ noted many periods of time when it appeared from the medical records that Plaintiff was not in treatment for her mental health impairments or was noncompliant with prescribed treatment (A.R. 124, 127). The ALJ's conclusion that "once the claimant became compliant with prescribed treatment on a sustained basis with Dr. Smith, her condition became manageable" is supported by substantial evidence in the record (A.R. 127). In addition to the ALJ's thorough summary of the evidence (A.R. 102-121), he provided an extended and thoughtful discussion about Plaintiff's mental health impairments and her resulting limitations in connection with the revised RFC (A.R. 124-28). He acknowledged her significant impairments, addressed contradictory record evidence bearing on her limitations, and, in accordance with the Appeals Council instructions, assessed the effect of treatment compliance on her functional abilities (A.R. 124-128). "Plaintiff has not demonstrated that the ALJ's application of the psychiatric review technique was inconsistent with the Appeals Council's remand order or otherwise was erroneous." *Bindner v. Astrue*, No. EDCV 07-00995 AJW, 2008 WL 2557480, at *3 (C.D. Cal. June 23, 2008).

In compliance with the Appeals Council's third directive, the ALJ considered and explained the weight he assigned to the opinion evidence from the nonexamining sources (A.R. 128-29). Drs. Warren and Lezier provided nonexamining opinion evidence about Plaintiff's

---

[6] The four functional areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation. 20 C.F.R. § 1520a(3) & (4).

mental health impairments. The ALJ explained that he gave "great weight" to the opinions of Dr. Warren because his assessments were consistent with the record as a whole, including with subsequently submitted records from Dr. Smith, Plaintiff's treating psychologist (A.R. 129). Dr. Warren opined that Plaintiff had mild restrictions in her activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. Based on Dr. Warren's review of the records, he concluded that Plaintiff would be able to carry out simple tasks in the context of a routine schedule but would not be able to handle moderately to highly complex or detailed tasks. He also opined that she would be able to relate adequately to co-workers and supervisors but would not be able to interact appropriately with members of the general public (A.R. 275). The ALJ gave lesser weight to Dr. Lezier's opinions because his assessed limitations were vague and poorly explained in contrast to the opinions of Drs. Warren and Smith (A.R. 130).

The ALJ was entitled to accord great weight to Dr. Warren's opinions, which, he noted, were corroborated to a certain degree by the treatment records and opinion evidence from Dr. Smith, the treating psychologist. The ALJ's reasons for doing so were clearly explained and well-grounded in the record. *See e.g., Bourinot*, 95 F. Supp. 3d at 180 (discussing the circumstances in which an ALJ may assign great weight to opinion evidence from a nonexamining state agency consultant). There was no error.

The ALJ also complied with the Appeals Council's directive to review Plaintiff's RFC and provide an appropriate rationale with references to record evidence. An ALJ examining a record on remand may revise a claimant's RFC category if, as is the case here, the revised RFC is supported by substantial evidence. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1223-24 (10th Cir. 2004). The only meaningful difference between the first and second RFCs crafted by the ALJ

was that, in the first RFC, the ALJ found that "[d]ue to psychological symptoms and chronic pain, the claimant would have been off-task at least 25% of the workday" from August 16, 2006 through October 7, 2011 (A.R. 309). As the ALJ acknowledged in his second opinion, there was little to no support in the record to confirm Plaintiff's claims of chronic pain as a distracting factor. The elimination of this factor from the RFC was well-supported by the record, which reflects occasions of transient pain due to accidents and falls (A.R. 128).

There is no dispute that Plaintiff copes with mental health challenges that interfere with her ability to function. Her mental health impairments are well-documented in the record. In the revised RFC, the ALJ accounted for significant limitations attributable to those impairments, including limiting Plaintiff to unskilled tasks, occasional co-worker contact, and no more than incidental public contact (A.R. 123). As noted above, the ALJ's discussion about limitations attributable to Plaintiff's mental health impairments was extended and thoughtful. He observed that Plaintiff's hospitalizations during the early portion of Plaintiff's alleged period of disability were associated with drug abuse, a lack of compliance with prescribed treatment, or (in one case) an adverse drug reaction. When she was released after these episodes, discharge notes regularly indicated that she was much improved (A.R. 600, 703, 857, 969-970, 981, 979-980). The ALJ explained in detail why he was not persuaded by comments and opinions from Mr. Armstrong, with whom Plaintiff seems to have treated from 2007 through January 2012 (records are sometimes sparse), and whose somewhat pejorative views were difficult to reconcile with the opinions and records of Dr. Smith, who assumed responsibility as Plaintiff's treating mental health care provider in August 2012 (A.R. 125-26, 1172). This is not an easy case. The ALJ judged Dr. Smith to be the more reliable reporter and fairly read his records as reflecting that, when Plaintiff was compliant with treatment on a sustained basis, her mental health impairments,

while real, were "manageable" (A.R. 127). It is well-settled that resolving such conflicts in the evidence, where reasonable minds could differ as to the outcome, is the province of the Commissioner and her designee, the ALJ. *Seavey v. Barnhart*, 276 F.3d 1, 10 (1st Cir. 2001). The ALJ's findings on remand are supported by substantial evidence in the record.[7]

B. The ALJ Gave Appropriate Weight to the Opinions of Dr. Smith, Plaintiff's Treating Psychologist.

Plaintiff also argues that, on remand, the ALJ failed to properly weigh the opinion of Dr. Smith, her treating psychologist (Dkt. No. 12 at 11-18). A treating psychologist's opinion as to "the nature and severity of a claimant's impairments is entitled to controlling weight if it is consistent with 'medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" *Cook*, 2017 WL 1135221, at *11 (quoting 20 C.F.R. § 404.1527(c)(2)). In certain circumstances, however, an ALJ "does not have to give a treating physician's opinion controlling weight." *Bourinot*, 95 F. Supp. 3d at 175 (citing *Arroyo v. Sec'y of Health & Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991)). An ALJ may discount the weight given to opinion evidence from a treating care provider if the opinion is inconsistent with substantial evidence in the record, including treatment notes, or observations and evaluations by the treating care provider or by examining or nonexamining physicians. *See id.* The regulations set out a non-exhaustive list of factors an ALJ should take into account when deciding what weight to assign to a treating source opinion, including the length of the treatment

---

[7] Finally, the ALJ complied with the Appeals Council's directives to obtain additional vocational evidence if warranted by the expanded record. He convened a new hearing, which included the testimony of a vocational expert (A.R. 214-18). Because the ALJ did not find Plaintiff disabled, he was not required to conduct further proceedings to determine whether drug or alcohol addiction were factors contributing to disability. Nonetheless, he addressed this point in his decision, finding that Plaintiff's substance abuse was not material to her overall functional capacity except insofar as sporadic overuse led to several hospitalizations (A.R. 121).

relationship and the frequency of examination; the nature and extent of the treatment

relationship; the supportability of the opinion; the consistency of the opinion with the record as a

whole; and whether the opinion came from a specialist. 20 C.F.R. § 404.1527(c)(2)-(6). "The

ALJ need not discuss each individual factor." *Cook*, 2017 WL 1135221, at *14 (citing *Healy v.*

*Colvin*, Civil Action No. 12-30205-DJC, 2014 WL 1271698, at *14 (D. Mass. Mar. 27, 2014)).

The regulations further require an adjudicator "to explain the weight given to a treating source

opinion and the reasons supporting that decision." *Bourinot*, 95 F. Supp. 3d at 176 (citing 20

C.F.R. §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6)). "Even in the context of a treating-source

opinion, the requirement is merely that the adjudicator supply 'good reasons' for the weight

given that opinion." *Crocker v. Astrue*, No. 07-220-P-S, 2008 WL 2775980, at *9 (D. Me. June

30, 2008) (quoting 20 C.F.R. § 404.1527(d)(2)). In effect, the ALJ gave controlling weight to

many aspects of Dr. Smith's opinion evidence. He carefully explained his reasons for taking

issue with the few aspects of Dr. Smith's opinion that he did not accept, and he supported his

explanation by reference to specific items in the record.

Dr. Smith treated Plaintiff commencing in or around August 2012 and continuing until at

least November 20, 2015. His initial diagnosis was PTSD and recurrent depression (A.R. 1172-

73). In Dr. Smith's November 13, 2013 mental health questionnaire, he indicated that Plaintiff

had mild restrictions in the activities of daily living and moderate difficulties in maintaining

social functioning and concentration, persistence and pace. He noted that difficulties in these

areas could be marked for "brief" periods of time. He stated that Plaintiff had experienced one

or two episodes of decompensation, each lasting at least two weeks, within a twelve-month

period.[8]  The ALJ explained that, given Dr. Smith's detailed reporting and credible treatment of

Plaintiff, he was giving significant weight to Dr. Smith's November 13, 2013 assessment (A.R.

126).  Indeed, the ALJ's so-called "B criteria" findings were consistent with those of Dr. Smith

and the RFC was crafted to accommodate the moderate limitations in social functioning and

concentration, persistence, and pace identified by Dr. Smith (A.R. 127).

The ALJ explained that he did not accept Dr. Smith's opinion about episodes of

decompensation because there was no indication after Dr. Smith commenced treating Plaintiff

that she was hospitalized for her mental impairments for an extended period of time, nor did his

treatment records describe an extended period of decline (A.R. 126-27).  This finding by the ALJ

is consistent with the record.  Plaintiff gave birth to her daughter in May 2013 (A.R. 1123-25).

During a May 7, 2013 appointment with advanced practice registered nurse Susan Williams to

discuss medications, Plaintiff told Ms. Williams that she had not taken medication for her mental

health impairments during the last twelve to eighteen months (A.R. 1125, 1172).  The ALJ did

not find evidence of a significant period of decline in Dr. Smith's treatment records prior to Dr.

Smith's completion of the mental health questionnaire (A.R. 126).  This was so notwithstanding

that Plaintiff was not taking medication and was pregnant and then caring for a newborn.  An

---

[8] An episode of decompensation is defined in the SSA regulations as an exacerbation or
temporary increase in symptoms or signs "accompanied by a loss of adaptive functioning, as
manifested by difficulties in performing activities of daily living, maintaining social
relationships, or maintaining concentration, persistence or pace. . . .  Episodes of
decompensation may be inferred from medical records showing significant alteration in
medication, or documentation of the need for a more structured psychological support system
(e.g., hospitalizations, placement in a halfway house, or a highly structured and directed
household), or other relevant information about the existence, severity, and duration of the
episode."  20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(C)(4).  "The term *repeated
episodes of decompensation each of extended duration* in the[ mental impairment] listings means
three episodes within 1 year, or an average of once every four months, each lasting for at least 2
weeks."  *Id*.

ALJ is not required to accept a treating care provider's opinion when that opinion lacks support in the provider's treatment records. *See, e.g., Bourinot*, 95 F. Supp. 3d at 176 (an ALJ is entitled to discount the opinions of a treating care provider when there is a "disconnect" between the care provider's treatment records and his or her opinions expressed in an impairment questionnaire).

Even if the ALJ had accepted that Plaintiff had suffered one or two episodes of decompensation during the fifteen months preceding Dr. Smith's completion of the mental health questionnaire (which he did not), such a finding would not have changed the result. Two episodes of decompensation within a year do not necessarily result in a finding of disability, *see* 20 C.F.R Part 404, Subpart P, Appendix 1, § 12.00(C)(4), and any such episodes documented by Dr. Smith would have occurred when Plaintiff was not on medication for her mental impairments, principally because of her pregnancy and the birth of her child (A.R. 1124). *See, e.g., Cookson v. Colvin*, 111 F. Supp. 3d 142, 152 (D.R.I. 2015) ("'Implicit in a finding of disability is a determination that existing treatment alternatives would not restore a claimant's ability to work.'") (quoting *Tsarelka v. Sec'y of Health & Human Servs*, 842 F.2d 529, 534 (1st Cir. 1988) (per curiam)). In view of the fact that Plaintiff's case was remanded with directions that the ALJ evaluate the effects of claimant's medication noncompliance on the severity of her mental impairments, it is fair to say that even if there was evidence that Plaintiff had suffered one or two episodes of decompensation while not taking medication, such evidence would not have changed the outcome because the ALJ found that the record, overall, reflected that when Plaintiff was compliant with treatment for her mental health impairments, they were manageable (A.R. 126). Finally, as the ALJ noted, any opinion from Dr. Smith that Plaintiff was unable to work was equivocal. Dr. Smith did not opine that Plaintiff's mental health impairments disqualified her from working. Instead, he stated that "[a] full-time job would certainly challenge

[Plaintiff's] coping ability at present" (A.R. 127, 1201). The ALJ's treatment of Dr. Smith's opinion evidence was carefully explained and well supported by the evidence. Contrary to Plaintiff's argument, I find no error and no basis for a remand.

V.  CONCLUSION

For the reasons stated above, Plaintiff's motion for an order reversing the Commissioner's decision is DENIED, and the Commissioner's motion to affirm the decision is GRANTED. Judgment shall enter for the defendant, and the Clerk's Office is directed to close the case on the court's docket.

It is so ordered.

Dated: January 31, 2019                           Katherine A. Robertson
                                                  KATHERINE A. ROBERTSON
                                                  UNITED STATES MAGISTRATE JUDGE